UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| v. | ) Case No. 04-10336-NMG |
| | ) |
| **JOSE SANTIAGO  ET AL.** | ) |
| | ) |
| **Defendants** | ) |

## GOVERNMENT'S PROFFER OF CO-CONSPIRATOR STATEMENTS

### Introduction

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, respectfully submits this motion seeking to admit against the Defendants numerous co-conspirator statements recorded by surveillance agents from intercepted telephone communications.  The Government expects that the evidence admitted at trial will show that Defendants, from about December 10, 2003 to about October 15, 2003, knowingly and intentionally conspired to distribute or possess with intent to distribute 1 kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. Over the course of the investigation, numerous telephone calls between co-defendants were intercepted by law enforcement agents.

### Examples of Co-Conspirator Statements

The following are typical examples of the statements to be

introduced:

Example 1: On June 7th, 2004, surveillance agents intercepted calls between Julio Santiago ("SANTIAGO") and Reynaldo Rivera ("RIVERA") in which they set up and confirmed the details of a heroin deal.  At approximately 11:54 a.m. that day, RIVERA called SANTIAGO and asked if the latter were coming that day and whether SANTIAGO had recorded the "CD."  In a subsequent call made at approximately 12:09 p.m., SANTIAGO asked if RIVERA wanted two different "CDs" or separate ones.  RIVERA replied by asking SANTIAGO to put them in two different cases.  Subsequent calls that day involved where SANTIAGO would be leaving "the papers" in a pouch.  Surveillance of SANTIAGO during this time revealed that he had placed an item inside of a vehicle which was registered to RIVERA and was parked in the parking lot of the apartment complex were RIVERA resides.  After SANTIAGO had departed the area, a surveillance agent opened the same door to RIVERA'S vehicle and, in a pouch on the inside of the door, found and retrieved two packages, each of which were later found to contain ten (10) grams of heroin.

Example 2: In a series of calls beginning at 4:41 p.m. on August 26, 2004, SANTIAGO spoke to co-defendant Jose TORRADO about "how many 'guys' are going to go up to the park."  TORRADO said "only one right now but that on Saturday, maybe 4 or 5 want to go up."  SANTIAGO later told TORRADO "he'll find the coffee in a garbage bag in the garbage."  SANTIAGO later spoke to TORRADO and asked if TORRADO found "it."  TORRADO said yes, "he found a coffee one."  SANTIAGO asked if TORRADO "left the car papers there."  TORRADO said he "left the papers under the driver's seat of Santiago's car, that he put it in a little hole in the corner."  While these intercepts were being made, agents followed SANTIAGO to the area of Black Brook Drive (where Edwin TORREZ lived) and Rosewood Lane, Lowell, Massachusetts where he parked in the "Redwood Terrace" housing complex.  He was seen by surveillance agents getting out of the van and entering 427 Rosewood Lane (subsequently identified as the residence of co-defendant Luis Sanchez).  At about 6:19 p.m., surveillance observed TORRADO enter Rosewood Lane in a white 1993 Buick sedan.  TORRADO parked his vehicle next to the SANTIAGO minivan and exited.  TORRADO then entered Santiago's minivan on the driver's side where he stayed for about 20 seconds.  TORRADO was observed by surveillance agents exiting Santiago's minivan carrying a white coffee cup.  He returned to his vehicle where he remained for about 1 minute before departing the area. TORRADO's vehicle was followed by surveillance agents.  It became apparent to the agents that TORRADO became aware of surveillance following him as his speed increased and he made several quick turns to evade

them.  TORRADO was stopped at about 6:31 p.m. by a uniformed Lowell Police Department officer.  While TORRADO was being questioned, Detective Figueroa of the Lowell Police Department observed RIVERA drive by TORRADO.  A search of TORRADO and his vehicle were performed with negative results and TORRADO was released.  Detective Figueroa retraced TORRADO'S route prior to being stopped and located a (white) McDonald's coffee cup which contained a hard cylinder object wrapped in gray duct tape further containing 10 grams of heroin. A latent fingerprint was detected on the coffee cup.  From a comparative analysis of TORRADO's fingerprints with the latent print, it was determined that TORRADO was the source of the latent fingerprint on the coffee cup.

Example 3: On June 6, 2004, in a series of calls, SANTIAGO spoke to co-defendant Jose RODRIGUEZ and asked if RODRIGUEZ "still need[ed] 'the money'" and RODRIGUEZ answered affirmatively. SANTIAGO then indicated that he was going to take "sixty (60) dollars" out of the bank and would then call RODRIGUEZ, but asked if RODRIGUEZ would be there for sure so that SANTIAGO did not make the trip for nothing.  RODRIGUEZ assured that he would be there.  SANTIAGO then reiterated that he would withdraw "that" from that "account" and they agreed to speak again later.  At approximately 2:30 p.m., a surveillance unit saw SANTIAGO drive the SANTIAGO minivan out of a small lot behind SANTIAGO'S 264 Mechanic Street residence.  Subsequently intercepted calls indicated that SANTIAGO was en route to meet RODRIGUEZ at his residence At approximately 4:06 p.m., SANTIAGO called RODRIGUEZ and indicated he was "there" (meaning RODRIGUEZ's residence).  At approximately 4:10 p.m., a surveillance agent saw SANTIAGO driving the SANTIAGO  minivan slowly past RODRIGUEZ's  address. After parking the SANTIAGO minivan, SANTIAGO was seen seated in Santiago's minivan, bending and shifting from one side to another, as if retrieving something from the van's interior. Approximately one minute later, the surveillance agent saw SANTIAGO exit Santiago's minivan and appear to fold under and then pull the bottom of his shirt.  Another surveillance officer then saw SANTIAGO walk to the rear of the residence and walk up the stairs to the second-floor apartment.  At approximately 4:39 p.m., a third surveillance officer saw SANTIAGO exit the residence, return to the SANTIAGO minivan and drive it out of the area.  At approximately 6:40 p.m., a surveillance officer saw RODRIGUEZ exit his apartment and walk from the rear of the premises out to Aiken Avenue, looking cautiously in all directions and with his right hand shoved deeply into the right pocket of his baggy running pants.  RODRIGUEZ then began to walk inbound (south) on Aiken Avenue, still looking cautiously in all directions.  Approximately a block and a half from his residence, RODRIGUEZ saw and waved down a black BMW driven by a Hispanic male later identified as Santiago Navarro.  RODRIGUEZ entered the

3

front passenger seat of the BMW, which then headed inbound (south) on Aiken Avenue.  A short while later, the BMW was stopped with the assistance of a marked police cruiser and both occupants were asked to and did exit the vehicle.  During the pat-frisk of RODRIGUEZ, a clear plastic baggie (containing 1 10-gram "finger" of heroin) fell down the inside of RODRIGUEZ'S right leg and out the bottom of his pants.  Another detective located in the rear passenger seat of the BMW a clear plastic bag containing what he immediately recognized as marijuana.  Navarro was found to have $1,430 in cash on his person and RODRIGUEZ was found to have $270 in cash on his person.  Both individuals were arrested and a loaded .22 caliber revolver was later retrieved from a small plastic case which was located under the driver's seat.  The Lowell Police Department then obtained a state warrant to search RODRIGUEZ'S apartment at 261 Aiken Avenue, 2nd Floor, Lowell, MA.  During that search, approximately 50 grams of heroin were found in and seized from a drawer in the master bedroom.  Based on the interceptions and surveillance that day, the "sixty dollars" that SANTIAGO referenced in his initial June 6 telephone conversation with RODRIGUEZ was a coded reference to 60 grams of heroin (the 10 grams of heroin seized from Rodriguez's person and the 50 grams of heroin seized from his residence).

Example 4: On August 27, 2004, at approximately 5:51 p.m., Pedro Miranda, a/k/a "TAVO," called SANTIAGO and discussed various things.  Later in the conversation, SANTIAGO told TAVO that he had gone there (to TAVO's residence) and had "left some papers" in the room that TAVO was painting. SANTIAGO told TAVO that he had done so, because TAVO had told SANTIAGO earlier that there were police around there ready to give SANTIAGO a "ticket."  SANTIAGO also told TAVO that he had left TAVO's house on foot, and that the police had followed him.  SANTIAGO repeated that he left the "papers" in the closet behind the stereo, behind some shoes.  TAVO replied that it was "no problem" because he was going there right away. (SANTIAGO has the term "papers" when referring to heroin on other occasions including June 7th when he left 20 grams of heroin for RIVERA in his car) or money in TAVO's residence because he suspected that law enforcement agents were following him and he did not want to have the drugs or money in his vehicle or on his person if stopped by law enforcement.[1]  For

---

[1] SANTIAGO was particularly concerned about law enforcement surveillance at this time because TORRADO, as discussed below, was stopped by police the day before (August 26, 2004).  There were numerous intercepted calls during this time between SANTIAGO and TORRADO about the stop, what might have caused the stop and the fact that TORRADO had "lost" (i.e., thrown out the window of his car) the drugs that he had received from SANTIAGO before the

4

another example, on September 2, 2004, at approximately 5:54 p.m., SANTIAGO used Target Telephone 1 to call TAVO on Target Telephone 4.  SANTIAGO told TAVO that he wanted to go there (to TAVO's location) to "fill out some papers."  TAVO agreed.  SANTIAGO advised TAVO that it "may take sometime."  Surveillance agents observed SANTIAGO arrive at TAVO's residence at approximately 7:04 p.m.  SANTIAGO remained at TAVO's residence until approximately 8:34 p.m.  During this time period, SANTIAGO arranged via Target Telephone 1 for several of his customers, including TORRADO, TORREZ, and RODRIGUEZ, to meet him there to conduct drug deals.  Agents were able to observe as each of these individuals came and left TAVO's residence.

These are but a few of the intercepted conversations which the Government seeks to admit the recorded telephone communications.  Under Fed. R. Evid. 801(d)(2)(E), co-conspirator statements are not hearsay if "made by a coconspirator of a party during the course and in furtherance of the conspiracy."  Moreover, admission of these statements does not violate Defendants' rights under the Confrontation Clause because they are nontestimonial in nature and fall into a firmly rooted hearsay exception.

## Argument

The government submits that the statements are properly admitted into evidence pursuant to Federal Rule of Evidence 801(d)(2)(E), as statements of co-conspirators of the defendants

---

stop.  There were also similar conversations between SANTIAGO and RIVERA, who had driven by TORRADO and the police during the stop and who immediately reported it to SANTIAGO.

during the course of and in furtherance of the conspiracy.

In order to qualify as admissions of a co-conspirator, statements must be made by a co-conspirator during the course of a conspiracy and in furtherance of the conspiracy. The government must show that a conspiracy that embraced the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy. United States v. Piper, 298 F.3d 47, 51-52 (1st Cir. 2002). See also United States v. Petrozziello, 48 F.2d 20, 23 (1st Cir. 1977). In United States v. Ciampaglia, 628 F.2d 632 (1st Cir. 1980), the Court outlined the procedures to be employed when co-conspirator statements are offered into evidence:

> [I]f the government attempts to introduce a statement under Fed. R. Evid. 801(d)(2)(E), the Court, upon proper objection, may, if it so chooses, admit the declaration subject to it being "connected up." At that time the court should inform the parties out of the hearing of the jury that: (a) the prosecution will be required to prove by a preponderance of the evidence that a conspiracy existed, that the declarant and defendant were members of it at the time that the declaration was made, and that the declaration was in furtherance of the conspiracy, (b) that at the close of all the evidence the court will make a final Petrozziello determination for the record, out of the hearing of the jury; and, (c) that if the determination is against admitting the declaration, the court will give a cautionary instruction to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to cure any prejudice.

Ciampaglia, 628 F.2d at 638 (footnotes omitted). In determining the admissibility of co-conspirator statements, the Court may

consider any relevant evidence, including the statement sought to be admitted. See, e.g., Bourjaily v. United States, 483 U.S. 171, 181 (1987); United States v. Rivera-Santiago, 872 F.2d 1073, 1092-93 (1st Cir. 1989).  Standing alone, however, a co-conspirator statement cannot establish by a preponderance of the evidence the existence of a conspiracy embracing both the declarant and the defendant. See United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993).

### A.   A Conspiracy Existed.

The charges against the defendants arose out an investigation conducted by DEA.  Information from a confidential informant ("CI-3") and subsequent law enforcement surveillance revealed that an individual (later identified as co-defendant Reynaldo Rivera) was engaged in a series of apparent drug transactions occurring in the parking lot of Rivera's residence at the Old English Village apartment complex at 235 18th Street in Dracut and that usually Rivera engaged in these hand-to-hand exchange with the operator of a minivan driven by a male later identified as Santiago.  Prior to the date of the conspiracy charged in the Superseding Indictment, physical surveillance in 2003 confirmed Rivera meeting with Santiago in the parking lot outside 235 18th Street and engaging in activity consistent with narcotics distribution, and trash-pulls associated with Rivera

7

during this same time period uncovered evidence of drug distribution.

Between December 2003 and January 2004, an undercover agent arranged several heroin transactions with Rivera that involved his "runners," co-defendants Zuleima Reyes and Santiago Arroyo. In each of these transactions, the undercover agent would negotiate the price and quantity of heroin and the location (usually Showcase Cinema parking lot in Lowell) to receive the heroin with Rivera (or with co-defendant Zuleima Reyes who would then contact Rivera) by telephone. These conversations were consentually recorded by TFA Chavez. Pen register data showed that Rivera's cell phone was then in contact with a telephone subscribed to by Rivera's runners, co-defendants Santiago Arroyo or Zuleima Reyes. Pen register data also showed that the Rivera cell phone called Reyes' cell phone after his meeting with Santiago. Subsequently intercepted calls pursuant to TIII orders, surveillance and seizures confirmed that Santiago was Rivera's source of supply.

As detailed in the government's previous oppositions to motions to suppress, beginning in March 2004 the DEA wiretapped five telephones and one paging device belonging to Santiago and/or his associates. Intercepted calls over the Target Telephones confirmed that Santiago was supplying large quantities

of heroin not only to his main customer, Rivera, but was making regular deliveries to and collecting drug monies from or otherwise dealing with numerous other drug customers, including the named co-defendants; that he had numerous drug associates including the defendants; and that he had a source of supply in New York (later identified as co-defendant Juan Nunez).

The consentual recordings and the T-III intercepts regarding heroin distribution, corroborated by physical surveillance, will establish well beyond a preponderance of the evidence that a conspiracy existed among the defendants with each of the co-defendant declarants.

Moreover, there also exists strong circumstantial evidence of the conspiracy as well. For example, On May 5, 1004, Lowell Police stopped Enrique Agosto and found on his person approximately 600 plastic baggies labeled "moonwalk" and depicting an astronaut. The bags contained approximately 15 grams of heroin. Those baggies match precisely the type of baggies seized from Jose Rodriguez's residence on April 18, 2003, and seized from Rodriguez during his arrest on October 15, 2004. Similarly, bags depicting a apple stamp were seized from several locations during and at the conclusion of the investigation -- including Edwin Torrez, Zuleima Reyes, and Jose Rodriguez.

Seizures at the conclusion of the investigation also

established strong circumstantial evidence of the charged conspiracy.  For example, on October 14, 2004, police stopped Santiago in his minivan after he had met with Juan Nunez in New York to receive a large quantity of heroin.  Inside a hidden compartment in Santiago's van agents discovered approximately 500 grams of heroin.  A search of Santiago's apartment in Leominster on October 15, 2004, uncovered approximately 115 grams of heroin, digital scales, a money counter, a finger press, a 9 mm Luger firearm and three silencers. Inside Rivera's apartment at 235 18th Street, Dracut, MA, agents discovered approximately 200 grams of heroin, a finger press, latex gloves and $3,200 in cash.  When agents went to 261 Aiken Avenue, 2nd Floor, Lowell, to execute an arrest warrant, Rodriguez refused to allow them entry.  After breaching the door, agents found Rodriguez in the bathroom inside the apartment.  Inside his left hand and on the floor next to his feet agents found heroin, which was contained in two plastic bags with an apple imprint.  Those two apple-imprint bags contained additional baggies depicting an astronaut with a "moonwalk" logo. A search of Miranda's residence at 212 Wilder Street, Lowell, uncovered, among other things, inositol (an agent used to dilute heroin), a surgical mask, rubber gloves, personal papers,  and a false social security card in the name of "Carlos Colon."  A search of a locker belonging to Edwin Torrez at the Mini Self-Storage

10

facility in Lowell on October 15th uncovered "It's Hot" and apple baggies (that were the same as the baggies containing heroin found on RODRIGUEZ and in REYES' apartment on that very day) and other items used in the packaging of heroin were found there. When REYES was arrested at her residence on October 15th, she voluntarily directed the agents to 4 fingers of heroin (40 grams) in her closet. And a search of Carlos SANCHEZ's residence in Fitchburg on October 15th revealed Procaine, an item that can be used in cutting and processing heroin for resale.

NUNEZ, who was SANTIAGO's source of supply (or, at a minimum, SANTIAGO's connection to a source of supply), was identified as having provided the ½ kilogram of heroin that was seized from SANTIAGO's minivan on October 14, 2004.

**B.   The Statements were in Furtherance of the Conspiracy.**

All of the statements that the government will seek to introduce into evidence were made in furtherance of the conspiracy under the law established by the United States Court of Appeals for the First Circuit. A statement is admissible under 801(d)(2)(E) so long as it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose." United States v. Flores-Rivera, 56 F.3d 319, 330 (1st Cir. 1995). This standard is administered flexibly. United States v. Garcia-Torres, 280 F.3d 1, 5 (1st Cir. 2002). The statement "need not

11

be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way." United States v. Martinez-Medina, 279 F.3d 105, 117 (1st Cir. 2002). A preponderance standard governs this finding. E.g., United States v. Perez-Ruiz, 353 F.3d 1, 11 (1st Cir. 2003).

Here, the statements plainly meet this standard.[2] All of the intercepted telephone communications were made between March 2004 and October 2004, within the period of the conspiracy alleged. The statements involve Defendants' efforts and attempts to negotiate, transfer, and consummate heroin transactions. The statements also show a demonstrated intent to thwart law enforcement's efforts to investigate them through coded language and counter surveillance. Consequently, the statements that the government seeks to admit were made during the course of and in furtherance of the charged conspiracy and are therefore admissible.

### C.  Admission of the co-conspirator statements does not violate Defendants' rights under the Confrontation Clause.

---

[2] The government is in the process of preparing finalized transcripts of the entirety of the recorded conversations which it intends to introduce in evidence at trial. See United States v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986) (finding that English-language translations of tape-recorded conversations that originally took place in Spanish are admissible as substantive evidence).

12

Co-conspirator statements made in course and furtherance of a conspiracy are nontestimonial in nature. United States v. Felton, 417 F.3d 97, 103 (1st Cir. 2005).  See also United States v. Hansen, 434 F.3d 92, 99 (1st Cir. 2006)  The admission of nontestimonial co-conspirator statements does not violate Defendants' rights under the Confrontation Clause.[3]  United States v. Felton, 417 F.3d 97, 103 (1st Cir. 2005).  See also Ohio v. Roberts, 448 U.S. 56, 66 (1980) (finding that co-conspirator statements fall within a firmly rooted hearsay exception, so their admission does not violate the Sixth Amendment); see also United States v. Inadi, 475 U.S. 387, 399-400 (1986) (Sixth Amendment does not require proof of unavailability of declarant for admission of co-conspirator statements).

The statements made by Defendants were made in furtherance of the conspiracy, as shown above, and not made with the expectation of their use in a court of law.  Therefore the statements are nontestimonial in nature, their admission does not violate the Defendants' rights under the Confrontation Clause, and no additional Confrontation Clause analysis is required.

---

[3] Sixth Amendment analysis regarding unavailability and prior opportunity for cross-examination is not required when the out-of-court statement in question is nontestimonial in nature. Crawford v. Washington, 541 U.S. 36, 68 (2004).

## Conclusion

Based on the foregoing, the government's motion for leave to introduce into evidence at trial co-conspirator statements from recordings of the intercepted telephone communications should be allowed.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By:  */s/William F. Bloomer*
WILLIAM F. BLOOMER
Assistant U.S. Attorney
BBO#553104
william.bloomer@usdoj.gov
(617) 748-3644

## CERTIFICATE OF SERVICE

I, William F. Bloomer, hereby certify that this document filed through the ECF system on September 15, 2006, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non registered participants this date via US Postal Service, postage prepaid.

/s/William F. Bloomer
WILLIAM F. BLOOMER

Date: 15 September 2006